## EVANSTON *v.* GUNN.

1. A party specifying his objection to the admission of evidence must be considered as waiving all others, or as conceding that there is no ground upon which they can be maintained.

2 The record kept by a person employed in the Signal Service of the United States, whose public duty it is to record truly the facts therein stated, is competent evidence of such facts.

3. During its change from a town to a village organization, under the statute of Illinois of April 10, 1872, the corporation is not released from the obligation to exercise the power with which it is invested to keep its streets and sidewalks in a safe condition. For neglect in that regard it is liable to a party who thereby sustains special damages.

4. Inasmuch as the village succeeds to all the property and funds as well as to the liabilities of the town, and has power to borrow money to provide for improvements rendered necessary by any casualty or accident happening after the annual appropriation, it cannot, when sued by such party, set up that its board of trustees were unauthorized to make that appropriation for the year in which the plaintiff's injury occurred, nor that the board and the other officers of the village were prohibited by law from adding to the corporate expenditures in any one year an amount above that provided for in the annual appropriation bill for that year.

5. Where the charge to the jury taken as a whole fully and fairly submits the law of the case, the judgment will not be reversed because passages extracted therefrom and read apart from their connection need qualification.

ERROR to the Circuit Court of the United States for the Northern District of Illinois.

This was an action of trespass on the case brought by Jessie Gunn against the village of Evanston, Ill., to recover damages which she had sustained April 22, 1873, by reason of the alleged neglect of duty on the part of the defendant.

The old town of Evanston was in 1863 incorporated under the General Laws of 1845, and the defendant, its successor, became incorporated as a municipal corporation, and assumed its present name, Oct. 15, 1872, under an act of the General Assembly, entitled " An Act to provide for the incorporation of cities and villages," approved April 10, 1872.

The laws of 1845 authorized the corporation, among other things, to keep open and in repair its streets and alleys by making pavements or sidewalks as to it might seem needful, and to levy and collect a tax for the purpose, and provided that it should be its duty to cause all its streets and alleys, and

all the public roads passing from and through it for one mile from the centre thereof, to be kept in good repair.

The corporation, to fulfil these duties, was authorized to require male residents to work on the roads, and it could make appropriations from the annual tax levy. The duties of a street commissioner were to be prescribed by ordinance. An ordinance of the town of Evanston declared them to be " to keep in repair streets, ditches, drains, crosswalks, and sidewalks. under the direction of the board of trustees."

The act of April 10, 1872, under which the new organization was effected, confers the following among other powers: " To lay out, establish, open, alter, widen, extend, grade, pave, or otherwise improve streets, alleys, avenues, sidewalks, wharves, parks, and public grounds, and vacate the same ; to prevent and remove encroachments or obstructions upon the same ; to construct and keep in repair culverts, drains, sewers, and cesspools, and regulate the use thereof ; to construct and keep in repair bridges, viaducts, and tunnels, and regulate the use thereof."

The act also authorizes the assessment and levy of taxes for corporate purposes; the making of annual appropriations to defray all necessary expenses and liabilities; and the borrowing of money under certain contingencies, for the same general purposes. It further provides that when a majority of the votes of the town cast at an election to be held for that purpose shall be for a village organization, " such town shall, from and henceforth, be deemed to be duly incorporated as a village under this act; but the town officers then in office shall continue as like officers of such village until their successors shall be elected or appointed under the provisions of this act."

The election for village officers is held on the third Tuesday in April of each year, and the fiscal year commences at that date.

It is further provided that " from the time of such change of organization, the provisions of this act shall be applicable to such cities and villages, and all laws in conflict therewith shall no longer be applicable. But all laws or parts of laws, not inconsistent with the provisions of this act, shall continue in force and be applicable to any such city or village,

the same as if such change of organization had not taken place. All ordinances, resolutions, and by-laws in force in any city or town when it shall organize under this act shall continue in full force and effect until repealed or amended, notwithstanding such change of organization; and the making of such change of organization shall not be construed to effect a change in the legal identity, as a corporation, of such city or town."

Sect. 12 provides: "All rights and property of every kind and description, which were vested in any municipal corporation under its former organization, shall be deemed and held to be vested in the same municipal corporation upon its becoming incorporated under the provisions of this act; but no rights or liabilities, either in favor of or against such corporation, existing at the time of so becoming incorporated under this act, and no suit or prosecution of any kind, shall be affected by such change."

It is further provided that the board of trustees "shall, within the first quarter of each fiscal year, pass an ordinance, to be termed the annual appropriation bill, in which such corporate authorities may appropriate such sum or sums of money as may be deemed necessary to pay all necessary expenses and liabilities of such corporation. . . . No further appropriations shall be made at any other time within such fiscal year, unless the proposition to make such has been first sanctioned by a majority of the legal voters of such village, either by a petition signed by them, or at a general or special election duly called therefor." "Neither the board of trustees, nor any department or officer of the corporation, shall add to the corporation expenditures in any one year any thing over and above the amount provided for in the annual appropriation bill of that year, except as is herein otherwise specially provided; and no expenditures for an improvement to be paid for out of the general fund of the corporation shall exceed in any one year the amount provided for such improvement in the annual appropriation bill: *Provided, however*, that nothing herein contained shall prevent the board of trustees from adding, by a two-thirds vote, any improvement, the necessity of which is caused by any casualty or accident happening after such annual

appropriation is made. The board of trustees may, by a like vote, order the president of the board of trustees and finance committee to borrow a sufficient amount to provide · for the expense necessary to be incurred in making any improvements, the necessity of which has arisen as is last above mentioned, for a space of time not exceeding the close of the next fiscal year, which sum, and the interest, shall be added to the amount authorized to be raised in the next general tax levy, and embraced therein." . . .

The plaintiff was a teacher in the public schools of the village of Evanston, and resided within its corporate limits on the west side of Sherman Avenue, where there was no sidewalk on the usual line. In the avenue, which is one hundred feet wide, and at a distance of some twenty feet from its west side, there was a ditch or drain running north and south through the entire limits of the village, and which the street commissioner, after the organization of the old town, had, by authority of its trustees, deepened and sided up with planks, and constructed, at the public expense, street-crossings so as to pass over it. Without objection on his part, property holders, in the summer of 1871, had covered it with planks for a sidewalk, and it was subsequently used as such. As the plaintiff was passing along the avenue in the morning, on her way to school, she fell with her right leg into a hole in the cover of the drain, which was from six to eight inches in width and from two to four feet in length. She sustained severe injuries to her spine and hip-joint, which will probably disable her for life. She was aware of the existence of the hole, but its exact location could not, by reason of the snow which covered it, be distinguished, and she was endeavoring to avoid it when the accident occurred.

· The hole was made by a runaway team in the fall of 1872, and was then insufficiently covered by the owner of a lot in the neighborhood. The planks were again broken at that place, and so remained for several weeks before the plaintiff was injured. In the mistaken impression that an ex-street-commissioner was still in office, parties had notified him of its condition, and there was evidence tending to show that the village officers were also aware of it.

The plaintiff, for the purpose of showing the direction and velocity of the wind and the falling of snow in the morning in question and the previous evening, offered in evidence the record made by a person employed at Chicago by the United States Signal Service. The defendant objected, because there was no law authorizing the record to be used in evidence, and because the same was not competent testimony. The court overruled the objection, and the defendant excepted. The record was then read, from which it appeared that a snow-storm occurred on the evening of April 21, 1873, and the wind blew at the rate of twenty miles an hour; that the storm continued until the following morning, when the wind blew at the rate of twenty-four miles an hour; that snow fell at that time sufficient to make $\frac{17}{100}$ of an inch in melted snow. It was also proved that Evanston was located ten miles north of Chicago, and that the snow-storm was as severe there as in that city.

The defendant introduced evidence tending to prove that from the organization of the village up to June, 1873, no appropriations had been made by it under said act of April 10, 1872; that the ditch was originally dug in the year 1855 by the drainage commissioners incorporated as such under the laws of the State; that by actual measurement the distance was thirty feet and five inches from the gate in front of the plaintiff's residence to the covered drain, and that the latter was six feet five inches wide; that the distance from the west line of the ditch to the railing of the park between the ditch and her house was three feet; that the passage left for a sidewalk between the park and her house was nine feet; that the ground there was hard, dry, and sodded, and that there was at the time of the accident no obstacle to prevent her from passing along that passage to the school where she taught; that the hole in the covered drain was six inches from the east side thereof; that the distance from the top of the cover to the bottom of the drain was four feet; that the trustees of the old town had never by any recorded proceedings authorized said sewer to be covered over nor a sidewalk to be laid on the top thereof; that no street commissioner had ever by any direct act consented that the cover to said sewer

should be built or used for the purposes of a sidewalk, although at the time the work was done the then commissioner was aware that the lot-owners doing it expected that the cover would be used as a sidewalk, and that he planked it at the intersecting streets and alleys at the public expense.

The court charged the jury, that if the defendant, when it came into corporate existence, found the ditch as a part of the drainage system of that locality running along one of the streets, it was bound in some way to protect the public against danger from said ditch, and that it made no difference for the purpose of the case whether the ditch was a drain formed by nature and existing from time immemorial, or had been created by artificial means only a few years prior to the formation of the corporation; that if it was rightfully there when the corporation came into existence, then it was bound to accept it, and provide for the safety of its citizens against it, and to keep it in repair; that the fact that the corporation had changed its organic law but a few months prior to the accident, and had not yet run the term of its municipal year when it could make an appropriation under the law under which it was then existing, did not relieve it from liability to keep the street in repair. The court also instructed the jury at large as to any contributory negligence on the part of the plaintiff.

There was a verdict for the plaintiff for $6,500, and judgment having been rendered thereon, the defendant sued out this writ of error.

*Mr. George O. Ide* for the plaintiff in error.
*Mr. Wirt Dexter, contra.*

MR. JUSTICE STRONG delivered the opinion of the court.

The admission in evidence of a record kept by a person employed by the United States Signal Service at Chicago was objected to at the trial, not because it had not been properly made, identified, and proved, but for the alleged reason that "there was no law authorizing such records to be used in evidence, and because it was not competent testimony." The defendants having thus specified their objection, it must be considered that all others were waived, or that there was no ground upon which others could stand. *Berks & Dauphin*

*Turnpike Co.* v. *Myers*, 6 Serg. & R. (Pa.) 12; *Chicago &*
*Alton Railroad Co.* v. *Morgan*, 69 Ill. 492. We have then only
to consider the objections that were made, — the only ones that
appear in the bill of exceptions, — and they present the question
whether the record, conceding it to be properly proved, was
competent evidence. It may be admitted there is no statute
expressly authorizing the admission of such a record, as proof
of the facts stated in it, but many records are properly admitted
without the aid of any statute. The inquiry to be made is, what
is the character of the instrument? The record admitted in
this case was not a private entry or memorandum. It had been
kept by a person whose public duty it was to record truly the
facts stated in it. Sects. 221 and 222 of the Revised Statutes
require meteorological observations to be taken at the military
stations in the interior of the continent and at other points in
the States and Territories, for giving notice of the approach
and force of storms. The Secretary of War is also required to
provide, in the system of observations and reports in charge of
the chief signal officer of the army, for such stations, reports,
and signals as may be found necessary for the benefit of agri-
culture and commercial interests. Under these acts a system
has been established, and records are kept at the stations desig-
nated, of which Chicago is one. Extreme accuracy in all such
observations and in recording them is demanded by the rules of
the Signal Service, and it is indispensable, in order that they
may answer the purposes for which they are required. They
are, as we have seen, of a public character, kept for public pur-
poses, and so immediately before the eyes of the community
that inaccuracies, if they should exist, could hardly escape ex-
posure. They come, therefore, within the rule which admits
in evidence "official registers or records kept by persons in
public office in which they required, either by statute or by
the nature of their office, to write down particular transactions
occurring in the course of their public duties or under their
personal observation." Taylor, Evid., sect. 1429 ; 1 Greenl.
Evid., sect. 483. To entitle them to admission it is not neces-
sary that a statute requires them to be kept. It is sufficient
that they are kept in the discharge of a public duty. 1 Greenl.
Evid., sect. 496. Nor need they be kept by a public officer

himself, if the entries are made under his direction by a person authorized by him. *Galt* v. *Galloway*, 4 Pet. 332. It is hardly necessary to refer to judicial decisions illustrating the rule. They are numerous. A few may be mentioned. *De Armond* v. *Nesmith*, 32 Mich. 231; *Gurney* v. *House*, 9 Gray (Mass.), 404; *The Catharine Maria*, Law Rep. 1 Ad. & Ec. 53; *Clicquot's Champagne*, 3 Wall. 114. We think, therefore, that there was no error in admitting the record kept by the person employed for the purpose by the United States Signal Service.

The exceptions to the charge, though numerous, in our opinion point to no error. Without going through in detail the statute under which the village was organized and the powers conferred upon it, it is enough to say that it had ample authority to keep the streets and walks in a safe condition at all times for passage. And the power carried with it the duty of exercising it. Nothing could have been a more palpable violation of that duty than permitting the continuance of such a trap as that into which the plaintiff below fell. And this duty was not suspended during the changes from a township to a village organization. The identity of the corporation was not destroyed by the change, and its obligations in regard to the streets, avenues, sidewalks, drains, &c., continued in full force. The fact that the board of trustees of the village were not authorized to make their annual appropriation for the year in which the plaintiff's injury occurred, if it was a fact, and that they, as well as every department and officer of the corporation, were prohibited by law from adding to the corporate expenditures in any one year any thing above the amount provided for in the annual appropriation bill for that year, is quite immaterial. The power to borrow money sufficient to provide for making any improvements, the necessity for which was caused by any casualty or accident happening after the annual appropriation, was expressly given. Besides, the village succeeded to all the property and funds of the township, as well as to its liabilities. It was organized in October, 1872, and the accident to the plaintiff occurred on the 22d of April, 1873, six months afterwards.

We see no error in the instruction given to the jury respecting contributory negligence of the plaintiff. It was full, — all

the case demanded, — and strictly accurate. Sentences may, it is true, be extracted from the charge, which if read apart from their connection, need qualification. But the qualifications were given in the context, and the jury could not possibly have been misled. Upon the whole, we think that the case was submitted in a manner of which there is no just cause of complaint.

                                        *Judgment affirmed.*